UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---

UNITED STATES OF AMERICA,
U.S. Department of Justice
Antitrust Division
450 Fifth Street, NW, Suite 8700
Washington, DC 20530,

                Plaintiff,

    v.

CONTINENTAL AG
Vanrenwalder Strasse 9
D-30165
Hanover, Germany,

    and

VEYANCE TECHNOLOGIES, INC.
703 S. Cleveland Massillon Road
Fairlawn, Ohio 44333

                Defendants.

---

## COMPLAINT

The United States of America ("United States"), acting under the direction of the Attorney General of the United States, brings this civil antitrust action to enjoin the proposed acquisition by Defendant Continental AG ("Continental") of Defendant Veyance Technologies, Inc. ("Veyance"). The United States alleges as follows:

**I.    INTRODUCTION**

       1.    Pursuant to an Agreement and Plan of Merger dated February 10, 2014, Continental has agreed to purchase Veyance from Carlyle Partners IV, L.P. for $1.8 billion. The

merger would combine two of the three leading suppliers of air springs used in commercial vehicles in North America.

2.  Continental has competed aggressively with Veyance for sales in North America, which has resulted in lower prices for commercial vehicle air springs. Elimination of the competition between Continental and Veyance likely would result in higher prices and decreased quality of service for customers, and would increase the likelihood that the two remaining suppliers would substantially reduce competition through successful coordination. As a result, the proposed acquisition likely would substantially lessen competition in the development, manufacture, and sale of commercial vehicle air springs in North America in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

## II. THE PARTIES TO THE PROPOSED TRANSACTION

3.  Defendant Continental AG, a corporation organized under the laws of the Federal Republic of Germany, is based in Hanover, Germany. Continental is a leading German automotive manufacturing company, specializing in tires, brake systems, and components, and it is one of the world's largest producers of rubber products. Its annual sales for 2013 were approximately $40 billion. ContiTech North America, Inc., of Montvale, New Jersey, is a part of ContiTech AG, a division of Continental. ContiTech North America produces and sells parts, components and systems, including commercial vehicle air springs, for the automotive engineering industry in North America.

4.  Defendant Veyance Technologies, Inc. is incorporated in Delaware with its headquarters in Fairlawn, Ohio. Veyance manufactures engineered rubber products for heavy-duty industrial, automotive and military applications. Veyance produces and sells automotive

and commercial vehicle parts, including commercial vehicle air springs, in North America. In 2013, Veyance had $2.1 billion in sales.

## III. JURISDICTION AND VENUE

5. The United States brings this action pursuant to Section 15 of the Clayton Act, 15 U.S.C. § 25, as amended, to prevent and restrain Defendants from violating Section 7 of the Clayton Act, 15 U.S.C. § 18.

6. The Court has subject matter jurisdiction over this action pursuant to Section 15 of the Clayton Act, 15 U.S.C. § 25, and 28 U.S.C. §§ 1331, 1337(a), and 1345. Defendants produce and sell commercial vehicle air springs in a regular, continuous, and substantial flow of interstate commerce. Defendants' activities in the development, manufacture, and sale of commercial vehicle air springs have had a substantial effect upon interstate commerce.

7. Defendants have consented to venue and personal jurisdiction in this District.

8. Venue is proper in this Court under Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391(b) and (c).

## IV. THE RELEVANT MARKET

### A. Product Description

9. Air springs are load-carrying rubber components constructed of a hollow rubber bellow sealed to metal plates attached at the top and bottom. Through the use of air compression, air springs dampen road shock and vibration. Air springs keep commercial vehicles–such as trucks, trailers and buses–at the same distance from the road irrespective of the weight being carried and also can be used as actuators to raise and lower objects. For example, air springs are used in buses to automatically maintain the same vehicle level and ride comfort, no matter how many passengers get on or off.

10. As commercial vehicle components, air springs are used in multiple locations in a vehicle: under the driver's seat, between the cab and underlying frame, and in suspensions between axle and frame for truck and trailer. Air springs in suspension systems of trucks, trailers and buses help commercial vehicles save fuel, reduce tire wear, and provide greater reliability. Air springs between the floor of the cabin and the seat provide for driver comfort and reduce driver fatigue. Air springs in the commercial vehicle cabin suspension system, between the frame and the cabin, regulate cabin movement.

11. The three types of air springs are (1) rolling lobe, which are used for truck, bus and trailer axles; (2) convoluted, or bellows, which serve the same function as rolling lobe but also are used as actuators to lift axles; and (3) sleeves, which are smaller springs generally used in cabs and seats for driver comfort. The vast majority of air springs for commercial vehicle applications sold in North America are rolling lobe air springs purchased by original equipment manufacturers ("OEMs") for truck, trailer and bus suspension systems.

12. Commercial vehicle OEMs in North America determine the type of air spring to be used in a particular platform. They can source the air springs directly from the air spring manufacturer or purchase a completed, fully integrated suspension system that includes air springs from a suspension system OEM. Suspension system OEMs source commercial vehicle air springs directly from the air spring manufacturer.

13. All air springs used by commercial vehicle OEMs must be of high quality and durability. Commercial vehicle OEMs require that commercial vehicle air springs meet rigid qualifications to ensure performance, quality, and engineering design fit. The qualification process includes not only qualification of the specific air spring to be used, via laboratory and road tests, but also inspection of the particular production facility where the air spring is to be

produced.  The rigorous process of qualifying an air spring for commercial vehicle OEMs can take more than two years.  Once the air spring is qualified, commercial vehicle OEMs work closely with the air spring manufacturer to ensure that the air spring is integrated into the overall design of the platform.

14. Air springs also are sold in the aftermarket, or the market for replacement air springs for commercial vehicles.  Commercial vehicle air springs for the aftermarket are purchased by the end user to replace, after time and wear, the air springs originally installed in commercial vehicles.  Commercial vehicle air springs for the aftermarket do not have to meet the rigid qualifications that commercial vehicle OEMs require, as replacement commercial vehicle air springs are not designed for a specific commercial vehicle platform.

### B. Relevant Product Markets

15. Rolling lobe, convoluted and sleeve commercial vehicle air springs perform distinct functions and, in general, cannot be substituted for each other.  For instance, an air spring used in a trailer suspension is not the same as an air spring used for a truck seat.  Accordingly, the three types of commercial vehicle air springs are not interchangeable or substitutable for one another, and demand for each is separate.  In the event of a small but significant increase in price for a given type of commercial vehicle air spring, customers would not stop using that air spring in sufficient numbers so as to defeat the price increase.  Thus, the development, manufacture, and sale of each type of commercial vehicle air spring is a separate line of commerce and a relevant product market within the meaning of Section 7 of the Clayton Act.

16. Although narrower product markets of rolling lobe, convoluted and sleeve air springs for commercial vehicles exist, the competitive dynamic for each type is nearly identical. The same firms manufacture and sell each of these products and each type of commercial vehicle

air spring is sold in similar competitive conditions. Therefore, the products may be aggregated for analytical convenience into a single relevant product market for the purpose of assigning market shares and evaluating the competitive impact of the acquisition.

### (1) Commercial Vehicle Air Springs for Original Equipment Manufacturers

17. Commercial vehicle OEMs require each air spring to meet rigid qualification standards to ensure performance, quality, and engineering design fit. Commercial vehicle air springs sold into the aftermarket for replacement purposes are not of sufficient quality or reliability to be used by commercial vehicle OEMs. Accordingly, commercial vehicle air springs for OEMs are not interchangeable with or substitutable for commercial vehicle air springs for the aftermarket, and demand for each is separate.

18. A small but significant increase in the price of commercial vehicle air springs for OEMs would not cause a sufficient number of OEMs to substitute commercial vehicle air springs manufactured for the aftermarket so as to make such a price increase unprofitable. Thus, the development, manufacture, and sale of commercial vehicle air springs for OEMs is a line of commerce and a relevant product market within the meaning of Section 7 of the Clayton Act.

### (2) Commercial Vehicle Air Springs for the Aftermarket

19. Commercial vehicle air springs for the aftermarket are sold for replacement purposes. The targeted customer is the commercial vehicle owner. Because commercial vehicle air springs for the aftermarket are not designed for a specific commercial vehicle platform, they do not have to meet the rigid qualifications that commercial vehicle OEMs require. Commercial vehicle air springs for the aftermarket are of lower quality and lesser durability than commercial vehicle air springs made for OEMs. Accordingly, commercial vehicle air springs for the aftermarket are not interchangeable or substitutable for commercial vehicle air springs sold to

OEMs.  Demand for commercial vehicle air springs used by OEMs is separate from demand for commercial vehicle air springs for the aftermarket.

20. A small but significant increase in the price of commercial vehicle air springs for the aftermarket would not cause customers to substitute commercial vehicle air springs for OEMs in sufficient numbers so as to make such a price increase unprofitable.  Thus, the development, manufacture, and sale of commercial vehicle air springs for the aftermarket is a line of commerce and a relevant product market within the meaning of Section 7 of the Clayton Act.

    **C.**     **Relevant Geographic Market**

        **(1)**     **Commercial Vehicle Air Springs for OEMs**

21. Commercial vehicle air springs are bulky but relatively lightweight.  Despite the light weight, the cost of transporting commercial vehicle air springs is high compared to the value of the product, because the manufacturers essentially have to pay to ship air.  Therefore, while shipping commercial vehicle air springs from overseas is feasible, it adds significant cost–approximately 10 to 15 percent–to the price of the product.  Import taxes also add additional costs to commercial vehicle air springs that are shipped from outside North America.

22. In addition, commercial vehicle OEMs require that the air springs production facility be qualified.  The qualification process includes inspection of the production facility by the customer.  Having to inspect and qualify a facility outside of North America adds both time and expense to the process.

23. Further, commercial vehicle OEMs require timely delivery of air springs, as they are an essential input into the final vehicle platform.  Procuring commercial vehicle air springs from overseas adds significant lead time to delivery, increases the risk of shipment delays, and

makes more difficult the rapid correction of quality shortcomings in delivered product. Thus, for commercial vehicle OEMs, purchasing air springs from outside North America involves the assumption of an unacceptable level of risk.

24. Therefore, to successfully sell commercial vehicle air springs for OEM use in North America, an air spring manufacturer must have an air spring production facility in North America.

25. OEM customers for commercial vehicle air springs in North America would be unwilling to switch to commercial vehicle air springs manufactured outside of North America to defeat a small but significant price increase. Accordingly, North America is a relevant geographic market for the development, manufacture, and sale of commercial vehicle air springs for OEMs within the meaning of Section 7 of the Clayton Act.

### (2) Commercial Vehicle Air Springs for the Aftermarket

26. For commercial vehicle air springs sold in the aftermarket, purchases are based on price, brand or reputation, and availability. As with commercial vehicle air springs for OEMs, the cost of shipping commercial vehicle air springs for the aftermarket, individually or in small quantities, from outside North America would make them more expensive than those sold in North America. Further, the additional lead time to ship commercial vehicle air springs for individual demand makes direct purchase from overseas unattractive to potential purchasers, who want their vehicles repaired in a timely manner. Therefore, a customer typically would not directly purchase commercial vehicle air springs for the aftermarket from outside of North America.

27. Customers would be unwilling to switch to commercial vehicle air springs manufactured outside of North America to defeat a small but significant price increase.

Accordingly, North America is a relevant geographic market for the development, manufacture, and sale of commercial vehicle air springs for the aftermarket within the meaning of Section 7 of the Clayton Act.

### D.     Anticompetitive Effects

#### (1)     Commercial Vehicle Air Springs for OEMs

28.     In North America, the market for the development, manufacture, and sale of commercial vehicle air springs for OEMs is highly concentrated and would become substantially more concentrated as a result of the proposed transaction. Continental and Veyance each have approximately 30 percent of the North American market for commercial vehicle air springs sold for OEMs. The only other competitor has approximately 40 percent of the North American market, so the acquisition would result in two firms holding 100 percent of the market.

29.     As articulated in the *Horizontal Merger Guidelines* issued by the Department of Justice and the Federal Trade Commission, the Herfindahl-Hirschman Index ("HHI"), discussed in Appendix A, is a measure of market concentration. Market concentration is often one useful indicator of the level of competitive vigor in a market and the likely competitive effects of a merger. The more concentrated a market, and the more a transaction would increase concentration in a market, the more likely it is that a transaction would result in a meaningful reduction in competition, harming consumers. Markets in which the HHI is between 1,500 and 2,500 points are considered to be moderately concentrated and markets in which the HHI is in excess of 2,500 points are considered to be highly concentrated. Transactions that increase the HHI by more than 200 points in highly concentrated markets are presumed likely to enhance market power.

30. In the North American market for the development, manufacture, and sale of commercial vehicle air springs for OEMs, the pre-merger HHI is 3,388; the post-merger HHI is 5,224, with an increase in the HHI of 1,836. Consistent with the Horizontal Merger Guidelines, this market is highly concentrated and would become substantially more concentrated as a result of the proposed acquisition.

31. A combined Continental and Veyance would have the ability to increase prices of commercial vehicle air springs sold to OEMs and to reduce the quality of service for these customers by limiting availability or delivery options.

32. In addition, Continental's elimination of Veyance as a strong, independent competitor in the development, manufacture, and sale of commercial vehicle air springs for OEMs likely would facilitate anticompetitive coordination between the remaining two suppliers. The two suppliers would be able to estimate each other's output, capacity, reserves, and costs, making coordinated interaction easier.

33. The transaction would substantially lessen competition in the development, manufacture, and sale of commercial vehicle air springs for OEMs in North America and lead to higher prices and decreased quality of service in violation of Section 7 of the Clayton Act.

**(2)   Commercial Vehicle Air Springs for the Aftermarket**

34. In North America, the market for the development, manufacture, and sale of commercial vehicle air springs sold in the aftermarket is highly concentrated and would become substantially more concentrated as a result of the proposed transaction. Veyance has approximately 33 percent of the market, Continental has approximately 17 percent of the market, and one other competitor has approximately 45 percent. Were the acquisition to proceed, two firms each would have close to a 50 percent share of the market.

35.     For the North American market for the development, manufacture, and sale of commercial vehicle air springs sold in the aftermarket, the premerger HHI is 3,403, the post-acquisition HHI is 4,525, and the acquisition would produce an increase of 1,122 in the HHI. Consistent with the Horizontal Merger Guidelines, this market is highly concentrated and would become substantially more concentrated as a result of the proposed acquisition.

36.     The proposed transaction likely would substantially lessen competition in the North American market for the development, manufacture, and sale of commercial vehicle air springs for the aftermarket and lead to higher prices and decreased quality of service in violation of Section 7 of the Clayton Act.

**E.     Difficulty of Entry**

**(1)     Commercial Vehicle Air Springs for OEMs**

37.     Timely and sufficient entry by additional competitors into the market for the development, manufacture, and sale of commercial vehicle air springs for OEMs is unlikely, given the substantial time and cost required to establish a qualified production facility and to establish a recognized brand and reputation in North America.

38.     Choosing an appropriate factory location, ordering the necessary equipment and setting up the factory for production of commercial vehicle air springs likely would take two or more years and would require a substantial investment. Once a location is chosen and the factory is producing, the OEM qualification process can take two or more additional years. Qualification requires a number of steps, and both the factory and the particular air springs to be used by the commercial vehicle OEM must be qualified.

39.     Because of the cost and difficulty of establishing a production facility in North America and gaining requisite OEM qualification, entry into the North American market for the

development, manufacture, and sale of commercial vehicle air springs for OEMs would not be timely, likely or sufficient to mitigate the anticompetitive effects of Continental's proposed acquisition of Veyance.

### (2) Commercial Vehicle Air Springs for the Aftermarket

40. The impact of the acquisition in the North American market for the development, manufacture, and sale of commercial vehicle air springs for the aftermarket would not be remedied quickly by the response of foreign suppliers. These suppliers lack a recognized brand and reputation in North America, and most lack the broad product portfolio, to supply commercial vehicle air springs that would be accepted by most OEMs. Foreign firms are not present in the North American market for the development, manufacture, and sale of commercial vehicle air springs for OEMs, so they do not have established reputations that would contribute to their acceptance in the aftermarket. Therefore, entry would not be timely, likely, or sufficient to mitigate the anticompetitive effects of Continental's proposed acquisition of Veyance.

## V. VIOLATIONS ALLEGED

41. Continental's proposed acquisition of Veyance likely would substantially lessen competition in North America for (1) the development, manufacture, and sale of commercial vehicle air springs for OEMs, and (2) the development, manufacture, and sale of commercial vehicle air springs for the aftermarket, in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

42. Unless enjoined, the proposed acquisition likely would have the following anticompetitive effects, among others:

    (a) actual and potential competition between Veyance and Continental in the relevant markets would be eliminated;

      (b)      competition generally in the relevant markets would be substantially lessened; and

      (c)      for the relevant products, prices would increase and the quality of service would decrease.

## VI.   REQUESTED RELIEF

43.    The United States requests that the Court:

      (a)      adjudge and decree that Continental's proposed acquisition of Veyance is unlawful and in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18;

      (b)      preliminarily and permanently enjoin and restrain defendants and all persons acting on their behalf from consummating the proposed acquisition of Veyance by Continental, or from entering into or carrying out any other contract, agreement, plan, or understanding, the effect of which would be to combine Continental with Veyance;

      (c)      award the United States the costs for this action; and

      (d)      grant the United States such other and further relief as the Court deems just and proper.

Respectfully submitted,

DATED: December 11, 2014

FOR PLAINTIFF UNITED STATES OF AMERICA:

_____
William J. Baer
Assistant Attorney General

_____
David I. Gelfand
Deputy Assistant Attorney General

_____
Patricia A. Brink
Director of Civil Enforcement

_____
Maribeth Petrizzi (D.C. Bar #435204)
Chief, Litigation II Section

_____
Dorothy B. Fountain (D.C. Bar #439469)
Assistant Chief, Litigation II Section

_____
Suzanne Morris (D.C. Bar #450208)
Dando Cellini
Tara Shinnick (D.C. Bar #501462)
Angela Ting (D.C. Bar #449576)
Soyoung Choe
James Tucker
United States Department of Justice
Antitrust Division, Litigation II Section
450 Fifth Street, N.W., Suite 8700
Washington, D.C. 20530
(202) 307-0924
(202) 514-9033 (fax)
Suzanne.Morris@usdoj.gov

## APPENDIX A

The U.S. Dep't of Justice and Federal Trade Commission, Horizontal Merger Guidelines § 5.3 (2010), available at http://www.justice.gov/atr/public/guidelines/hmg-2010.html, provide the method for calculating the HHI. The HHI is calculated by squaring the market share of each firm competing in the market and then summing the resulting numbers. For example, for a market consisting of four firms with shares of 30, 30, 20, and 20 percent, the HHI is 2,600 ($30^2 + 30^2 + 20^2 + 20^2 = 2,600$). The HHI takes into account the relative size distribution of the firms in a market. It approaches zero when a market is occupied by a large number of firms of relatively equal size and reaches its maximum of 10,000 points when a market is controlled by a single firm. The HHI increases both as the number of firms in the market decreases and as the disparity in size between those firms increases.